

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

JUAN JIMENEZ-NAVA a.k.a.
CESAR EDMUNDO MURGUIA
                    Movant

v.

UNITED STATES OF AMERICA
                    Respondent

§
§
§
§
§
§
§
§
§
§
§

CASE NO. 4:20-CV-476-A
        (4:18-CR-00093-A-3)

---

## MOTION TO AMEND THE MEMORANDUM OF LAW IN SUPPORT OF A MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

---

NOW COMES, Movant, Juan Jimenez-Nava a.k.a. Cesar Edmundo Murguia, by and through pro-se, who hereby files the foregoing Memorandum of Law in Support of his motion to pursue a collateral claim pursuant to 28 U.S.C. § 2255. This motion under 2255 is brought under the Governing law of Strickland v. Washington, 466 U.S. 668, 684 -86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Movant respectfully asks this Honorable District Court to liberally construe his pleadings under the standard governing pro-se submissions as announced in the Supreme Court's decision of Haines v. Kerner, 404 U.S. 519, 92 S. Ct. 549, 30 L. Ed. 2d 652 (1972). Movant's Memorandum of Law is clear in demonstrating his Constitutional Injury due to in-effective assistance of counsel. Also explained is how negligence, misrepresen-tation and prejudice caused Movant to involuntary plead guilty. As a result Movant suffered the following:

1. Movant suffered a Fourth Amendment violation due to the Ineffective Assistance of Counsel for failure to investigate the Government's illegal warrantless search and seizure.

2. Counsel was ineffective for failure to file a motion to suppress the evidence found inside the apartment.

3. Movant received Ineffective Assistance of Counsel when Counsel failed to properly appraise him of the lack of investigation on Movant's defense strategy.

4. Counsel was Ineffective for her failure to object to hearsay statements.

TABLE OF CONTENTS

I. INTRODUCTION
   The language of the Fourth Amendment

II. LEGALLY SIGNIFICANT FACTS
   A. Procedural History
   B. Factual Allegations
   C. Agents Coerced a Non-Authorized Rivera-Diaz to Consent

III. JURISDICTION

IV. GROUNDS FOR RELIEF
   A. Ground One:
      Movant suffered a Fourth Amendment violation due to the
      ineffective assistance of counsel for failure to investigate
      the Government's illegal warrantless search and seizure.

   B. Ground Two:
      Counsel was ineffective for failure to file a motion to
      suppress the evidence found inside the apartment.

   C. Ground Three:
      Movant received ineffective assistance of counsel when counsel
      failed to properly appraise him of the lack of investigation
      on Movant's defense strategy.

   D. Ground Four:
      Counsel was ineffective for her failure to object to hearsay
      statements.


V. PRAYER FOR RELIEF

TABLE OF AUTHORITIES

SUPREME COURT CASE LAW

1.  Berger v. United States, 295 U.S. 78, 88 (1935)                20,
2.  Brady v. United States, 397 U.S. 742, 748 (1970)              20,
3.  Cuyller v. Sullivan, 466 U.S. 335, 344 (1980)                 21,
4.  Gideon v. Wainwright, 372 U.S. 335, 344 (1963)                23,
5.  Groh v. Ramirez, 540 U.S. 551 (2004)                          2,7,
6.  Haines v. Kerner, 404 U.S. 519 (1972)                         i
7.  Hawk v. Olson                (1945)                           16
8.  Henderson v. Morgan, 426 U.S. 637 (1976)                      20
9.  Hill v. Lockhart, 474 U.S. 52, 59 (1985)                      18,20,
10. Hudson v. Michigan, 574 U.S. 586, 589 (2006)                  14
11. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)              6
12. Johnson v. United States, 333 U.S. 10, 14 (1948)             14
13. Katz v. United States, 389 U.S. 347, 357 (1967)              14
14. Kimmelman v. Morrison, 477 U.S. 365 (1986)                    17,20
15. Kimmelman v.Robinson, 477 U.S. 365 (1986)                     21
16. Kirk v. Louisiana, 536 U.S. 635, 638 (2002)                   2
17. Kyllo v. United States, 533 U.S. 27, 31 (2001)                2
18. Lafler v. Cooper, 566 U.S. 156, 162 (2012)                    21
19. McMann v. Richardson, 397 U.S. 759, 771 (1970)                21
20. Michel v. Louisiana, 350 U.S. 91, 100-01 (1955)               17
21. Mincey v. Arizona, 437 U.S. 385 (1978)                        14
22. Parker v. North Carolina,      (1970)                         16
23. Payton v. New York, 444 U.S. 573, 590 (1980)                  2
24. Powell v. Alabama, 287 U.S. 45, 68-69 (1932)                  23
25. Quicksall v. Michigan,              (1950)                    16
26. Richards v. Wisconsin, 520 U.S. 385, 394 (1997)              14
27. Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973)           7,8
28. Smith v. O'Grady,                   (1941)                    16
29. Strickland v. Washington, 466 U.S. 668 (1984)                 i,17,18,20
30. Tennessee v. Garner, 471 U.S. 1, 7     (1985)                 13
31. Terry v. Ohio, 392 U.S. 1, 19n. 16 (1968)                     13
32. United States v. Cronic, 466 U.S. 648, 658 (1984)            17
33. Walker v. Johnston,                 (1941)                    16
34. Wells v. United States,             (1943)                    16
35. Wiggins v. Smith, 539 U.S. 510, 521 (2003)                    17
35. Wilson v. Arkansas, 514 U.S. 927, 931-32 (1995)              14

DISTRICT COURT CASE LAW

1.  Bazan v. Hidalgo County, 246 F. 3d at 490 (5th Cir. 2001)              13
2.  Flores v. City of Palacios, 381 F. 3d 396 (5th Cir. 2004)             13
3.  Jones v. Cain, 56 F. 3d 662, 666 (5th Cir. 1995)                      20
4.  Morris v. Thaler, 425 Fed. Appx. 415 (5th Cir. 2011)                  7,21
5.  Rios-Delgado v. United States, 117 F. Supp 2d 581, 588-89(W.D. Tex. 2000)  24
6.  Streetman v. Lynaugh, 812 F. 2d 950, 957 (5th Cir. 1987)              7
7.  Trent v. Wade, 776 F. 3d at 382 (5th Cir. 2015)                       14
8.  United States v. Amaya, 111 F. 3d 386, 389 (5th Cir. 1997)           20
9.  United States v. Cavitt, 550 F. 3d 430 (5th Cir. 2008)               21
10. United States v. Galberth, 846 F. 2d 983, 987 (5th Cir. 1988)        9
11. United States v. Gomez-Diaz, 712 F. 2d 949, 951 (5th Cir. 1983)      8
12. United States v. Gomez-Moreno, 479 F. 3d 350, 354 (5th Cir. 2007)    9
13. United States v. Jones, 239 F. 3d 716, 719 (5th Cir. 2011)           9
14. United States v. Hernandez, 234 F. 3d 252, 254 (5th Cir. 2000)       22
15. United States v. Kellet, 981 F. 2d 1464, 1470 (5th Cir. 1993)        9
16. United States v. Olivier-Becerril, 861 F. 2d at 426 (5th Cir. 1988)  9
17. United States v. Rogers, 905 F. 2d 189, 192 (5th Cir. 1990)          7
18. United States v. Wiliamson, 183 F. 3d 458, 462 (5th Cir. 1999)       23

## I. INTRODUCTION

The language of the Fourth Amendment to the United States Constitution appears to require the police to obtain a warrant before entering a home to make an arrest. A home arrest involves both a "search" and a "seizure": a "search" of the home and a "seizure" of the person found there.

The Fourth Amendment Provides:

"The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but up on probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "The Fourth Amendment protects people, not places." The right of privacy is the right to be let alone by other people.

Although the Fourth Amendment protects a person's privacy in other places, the United States Supreme Court has stated that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." The protection starts at the physical limits of a home. Even placing a foot in the doorway amounts to an entry of the home for Fourth Amendment purposes.

The Fourth Amendment requires probable cause to detain an individual and search their property absent a clear exception to this rule. Probable cause is a reasonable basis for believing that a crime may have been committed or that evidence of a crime is located at a particular location.

If an individual is detained and their property search in violation of The Fourth Amendment, the evidence discovered as a result of said search must be suppressed as fruit of the poisonous tree.

Ineffective Assistance of Counsel requires that counsel's performance fall below an objective standard of reasonableness and that the defendant was prejudice due to counsel's deficient performance. Failure to suppress evidence discovered through an illegal warrantless search is objectively deficient performance. Counsel failed to suppress evidence discovered through the illegal warrantless search of the apartment where Movant was found in. Due to counsel's failure to suppress evidence discovered through the illegal warrantless search of the apartment, Movant entered a plea of guilty. Movant would not have entered a plea of guilty had the evidence discovered through the illegal warrantless search of the apartment been suppressed. The proper remedy for ineffective assistance of counsel is vacation of the judgment.

1

DEA agents' illegal warrantless search of the aprtment where Movant was an
overnight guest violated The Fourth Amendment, counsel's failure to suppress
the fruits of the illegal warrantless search constitutes ineffective assistance
of counsel, and Movant's judgment should be vacated. U.S. Supreme Court: Groh v.
Ramirez, 540 U.S. 551, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004)(" 'the right of
a man to retreat into his own home and there be free from unreasonable government
intrusion' stands 'at the very core' of the Fourth Amendment"), quoting Kyllo v.
United States, 533 U.S. 27, 31, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001); Kirk v.
Louisiana, 536 U.S. 635, 638, 122 S. Ct. 2458, 2459, 153 L. Ed. 2d 599, 602
(2002)(per curiam)("[T]he Fourth Amendment has drawn a firm line at the entrance
to the house.") quoting Payton v. New York, 444 U.S. 573, 590, 100 S. Ct. 1371,
63 L. Ed. 2d 639 (1980).

## II. LEGALLY SIGNIFICANT FACTS

### A. PROCEDURAL HISTORY

1. On April 5, 2018, a criminal complaint was filed in the Fort Worth Division
of the Northern District of Texas. The criminal complaint alleged defendants
Juan Jimenez-Nava, a.k.a. Cesar Edmundo Murguia (Jimenez-Nava) and two others.

2. On April 18, 2018, Jimenez-Nava was charged by Indictment with Conspiracy to
possess with intent to distribute a controlled substance 21 U.S.C. §§ 846 & 841
(a)(1) and (b)(1)(B).

3. On May 25, 2018, Jimenez-Nava appeared before U.S. District Judge John McBryde,
in Fort Worth, for a rearraignment hearing. Jimenez-Nava pleaded guilty to the
one-count Indictment. There is no plea agreement in this case.

4. This Court held a sentencing hearing on October 12, 2018, and Jimenez-Nava
was sentenced to 262 months incarceration.

### B. FACTUAL ALLEGATIONS

1. On March 28, 2018, DEA agents received information from a confidential source
(CS) who received methamphetamine from a source of supply located in Mexico. The
CS identified the source as "Viejoto." The CS engaged in monitored conversations
with Viejoto via text message and the Whatsapp application via a Mexican telephone
number regarding the purchase of methamphetamine. Through this conversation the
CS arranged for an undercover officer (UO) to purchase methamphetamine from Viejoto.

2. The UO engaged in a series of telephone calls with an unknown person via a
Mexican telephone number provided by the CS wherein he agreed to purchase 18

kilograms of methamphetamine for the price of $5,500 per kilogram. On April 3, 2018, the UO received a telephone call from another Mexican telephone number and spoke to an unidentified female. The UO and the female arranged to conduct the transaction the following day. The female directed the UO to drive to 3353 Lombardi Lane in Dallas to conduct the transaction. She stated she would send someone to conduct the transaction that would be driving a Jeep Cherokee.

3. On April 4, 2018, the UO received a telephone call from Ixta-Urena who advised she was en route to deliver the methamphetamine. The UO stated he was waiting at a Fiesta grocery store to conduct the transaction. Ixta-Urena state she did not want to conduct the transaction at the grocery store because there were surveillance cameras and security guards present. They subsequently agreed to meet in the parking lot. Ixta-Urena called the UO again and directed him to meet near a dumpster in the back of the parking lot. She advised the area near the dumpster was not monitored by surveillance cameras.

4. Ixta-Urena subsequently arrived at the scene in a Jeep Cherokee accompanied by Rivera-Diaz in the passenger seat. Ixta-Urena contacted the UO and parked her vehicle adjacent to the UO's vehicle. Ixta-Urena approached the UO's vehicle and asked him to drive to another area of the parking lot. The UO asked to see the "merchandise" before they moved. Ixta-Urena unlocked the back door of the vehicle and advised the 18 kilograms of methamphetamine was inside. The UO opened the door of the vehicle and observed plastic trash bags inside of a laundry basket. The UO opened one of the trash bags and observed several gallon-sized plastic baggies containing methamphetamine. The UO gave a prearranged signal and Fort Worth, Texas, Police Department (FWPD) officers responded to the scene and placed Ixta-Urena and Rivera-Diaz under arrest. A search of the vehicle revealed the trash bags in the in the laundry basket contained 18 baggies which contained a total of 19.7 kilograms (19,732 grams) of methamphetamine.

5. A search of Rivera-Diaz revealed a key along with other personal items. Officers conducted a post-arrest interview of Rivera-Diaz. He stated the key belong to an apartment on Webb Chapel Road near the Fiesta grocery store where he was arrested. Rivera-Diaz stated he picked up the methamphetamine found in Ixta-Urena's vehicle from this apartment. He observed additional narcotics at the apartment and an unidentified Hispanic male inside the apartment. He stated he possessed a key to the apartment and usually entered the apartment using the key without knocking. Rivera-Diaz stated he had recently crossed the Mexican border illegally one month prior via a smuggler. Upon arrival, he lived with Ixta-Urena at her house. He attempted to find legitimate employment and was unsuccesful. Ixta-Urena asked

Rivera-Diaz to accompany her on deliveries and offered to pay him $1,000 to
$1,500 per week. When asked what they delivered, Rivera-Diaz stated, "the same
stuff you found in the car."

6. Rivera-Diaz stated he and Ixta-Urena recently made two previous deliveries of
5 kilograms of methamphetamine and 2 kilograms of methamphetamine. Ixta-Urena
notified Rivera-Diaz when a delivery needed to be made and was present for each
transaction. Ixta-Urena always drove the vehicle because Rivera-Diaz was afraid
to and because he was unable to navigate the area. Ixta-Urena provided Rivera-Diaz
with the key to the Webb Chapel apartment one week prior. He reported the apartment
was normally occupied by a Hispanic male whom he did not know. Rivera-Diaz would
enter the apartment using the key and retrieve the methamphetamine. Ixta-Urena
waited in the vehicle while Rivera-Diaz went inside. Rivera-Diaz entered the apart-
ment, without knocking and the Hispanic male would provide the intended amount of
methamphetamine. Ixta-Urena maintained possession of an counted all proceeds from
the narcotics transactions. Rivera-Diaz observed Ixta-Urena count a large amount
of currency at her residence in North Richland Hills several days prior to his
arrest.

7. Rivera-Diaz led officers to 9765 webb Chapel Road, Apartment 2014, in Dallas.
Officers determined the key found in Rivera-Diaz's pocket matched the front door
lock of the apartment. Upon entry into the apartment, officers found Jimenez-Nava
in the living room and placed him under arrest. Officers observed several items of
equipment used to convert methamphetamine from liquid to crystal form and a
chemical protective suit. Officers located 10 plastic bags and one plastic container
of methamphetamine inside the master bedroom closet.

8. Officers conducted a post-arrest interview with Ixta-Urena. She stated she did
not know what was in the laundry basket found in her vehicle and she was trans-
porting clothing for a friend "Fernando." Ixta-Urena stated she was not paid any
money to "do a favor" for Fernando. She met Fernando in Apatzingan, Michoacan,
Mexico. She reported she was in the United States illegally and on April 4, 2018,
she received a call from a friend of Fernando asking her to deliver clothes to
someone. She picked up the clothes from an unidentified Hispanic male in the
parking lot of the Fiesta grocery store. She thought the circumstances surrounding
the transaction were "strange." Ixta-Urena identified Rivera-Diaz as her nephew
and stated she asked him to accompany her on the trip because she was "scared."
She stated Rivera-Diaz had recently arrived from Mexico two weeks earlier. Ixta-
Urena stated she could not remember her address or place of employment. Officers
identified a piece of mail inside Ixta-Urena's vehicle which was addressed to

7048 Green Ridge Trail in North Richland Hills, Texas. Ixta-Urena's stated she leased this address from her sister, Lorena Garcia, and resided there with her family. She stated she had approximately $3,000 located in her bathroom.

9. Officers conducted a search of Ixta-Urena's residence located at 7048 Green Ridge Trail in North Richland Hills, Texas. Ixta-Urena directed officers to a set of drawers in the master bathroom where officers located $10,660. Using an average price of $5,500 per kilogram of methamphetamine, the $10,660 converts to a total of 1.9 kilograms of methamphetamine.

Movant's argument in regards to what was previously stated on Paragraphs 1-9 are the following:

i)   The agents although having the option to do so, did not request a search warrant;

ii)  The agents found a key in a 19 year old Hector Rivera-Diaz's pocket after he was arrested; they told him they would set him free to return to Mexico, (as he was new to the USA having been here 14 days), if he just told them where the apartment was. Rivera-Diaz is 19 years old with 8 grade education;

iii) Rivera-Diaz did tell the agents where the apartment was, but did not have common authority over the apartment as he only went to the apartment for two commercial transactions; to pick up drugs and he did not live there or even stay there; the agents knew this as, Rivera-Diaz told them this making his consent clearly invalid. (See Exhibit 2, Paragraph 11);

iv)  Rivera-Diaz statement under penalty of perjury clearly states he did not give the agents ANY TYPE OF CONSENT TO SEARCH, OR SEARCH AUTHORITY;

v)   Finally agents took the key, entered without knocking or announcing their presence at the front door. They entered the Dallas apartment having no idea if their stelth entry would trigger violence, would capture anyone or would secure more drugs. They could have and should have sought Judicial search warrant approval, as they had the option to do so.

Movant's counsel had a duty to independently research the law and investigate the facts surrounding the warrantless search of the apartment. This should have been very obvious to counsel. Why this did not take place is today still unknown and cannot be sound trial strategy. Thus, a person who is merely present in another's dwelling to engage in a purely commercial transaction such as narcotics trafficking, who is on the premises for a relatively short period of time, and who does not have a previous connection with the householder, has no legitimate expectation of privacy in the premises and a warrantless search does not violate his Fourth Amendment Rights.

As this Memorandum proves Rivera-Diaz did not have Fourth Amendment standing. As a result of this factor and others further explained below, he could not of provided consent to search the apartment, and as the record confirms, the arresting officers did know this or should have known this.

There are six exceptions to the warrant requirement: search incident to lawful arrest, plain view, consent, stop and frisk, automobile exception, emergencies/hot pursuit.

For a Consent Search, officers should obtain consent either from the individual whose property will be searched or from a third party who has common authority over the premises. However, a third party's consent is not valid if another cohabitant of the premises is physically present and objects at the time of the request. The burden of establishing common authority rests on the Government. Common authority is not based on a property interest, but rests on mutual use of the property. A person has common authority if he or she has joint access or control for most purposes. In determining whether a person had joint access or control, a Court will consider factors such as whether the person: (1) has his or her name on the title, lease or occupancy agreement; (2) contributed to the rent; (3) went there without the principal occupant; or (4) invited others there.

"Rivera-Diaz entered the apartment, without knocking, and the Hispanic male would provide the intended amount of methamphetamine." (See PSR Page 5, Paragraph 10). Why would someone that has authority over a property in this case the apartment that can go in and out as he pleases ask for someone else to provide him with the drugs. This proves, Rivera-Diaz never went to the apartment when the unknown Hispanic male was not present. Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S. Ct. 2793, 2798, 111 L. Ed. 2d 148, 157 (1990) (although girlfriend had a key, she lacked actual authority to consent to search of boyfriend's apartment, because she "never went there herself when he was not there" and other factors; but Court remanded to consider apparent authority issue).

Agents faced with ambiguous or unclear  situations must make further inquires before engaging in warrantless searches. If information gleaned from those inquires is insufficient to establish apparent authority, the Fourth Amendment demands that the agents procure a warrant. Thus, agents cannot rely on the apparent authority doctrine to justify a warrantless search based on a third party consent when they lack a sufficient factual basis to conclude that the third party had the authority to consent. If the agents do not learn enough if the circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry.

When police intentionally bypass a suspect who is present and known by them to possess a superior privacy interest, the validity of third party consent is less certain.

DEA agents failed to knock and announced their presence even asked for Movant's consent as the record shows he was the only person in the apartment at the time of their warrantless entrance, agents were informed by Rivera-Diaz of an "unknown Hispanic male" making it clear that if hypothetically Rivera-Diaz had authority to consent there was someone else in the apartment making this property subject to mutual use which means that this other person had also authority over the apartment and Government's failure to ask for his consent is consider a violation of his Fourth Amendment Rights.

C. <u>AGENTS COERCED A NON-AUTHORIZED RIVERA-DIAZ TO CONSENT</u>

<u>Groh v. Ramirez</u>, 540 U.S. 551, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004)(warrantless search or seizure in home may be justified by "consent or exigency"); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 248, 93 S. Ct. 2041, 2059, 36 L. Ed. 2d 854, 875 (1973)("We hold only that when the subject of a search is not in custody and the state attempts to justify the search on a basis of his consent The Fourth and Fourteenth Amendment require that it demonstrate that the consent was in fact voluntarily given...")

1. During a controlled drug buy, not at the apartment agents arrested a young male a 19 year old Hector Rivera-Diaz and after handcuffing him, searching him the agents located a key. Agents systematecally and psychologically coerced Rivera-Diaz to tell them where the apartment was by using the "vulnerable subjective state," of Rivera-Diaz and promising him they would let him go back to Mexico, (releasing him that day) in exchange for the location of the apartment. (See Exhibit 2, Paragraphs 5, 8 and 9). Although agent Brian Finney claimed in the sentencing hearing that Rivera-Diaz gave them "search consent" this claim was one hundred percent false. (See Exhibit 2, Pargraph 14) statement of Rivera-Diaz. In the <u>United States v. Rogers</u>, 905 F. 2d 189, 192 (5th Cir. 1990), the Court stated, "that a confession induced by an assurance of no prosecution is not voluntary"; also see <u>Streetman v. Lynaugh</u>, 812 F. 2d 950, 957 (5th Cir. 1987), stating; certain promises, if not kept, are so attractive that they render a resulting confession involuntary... a promise of immediate release or that any statement will not be used against the accused is such a promise. See <u>Morris v. Thaler</u>, 425 Fed. Appx. 415, 2011 (5th Cir. 2011). (See Exhibit 2, Paragraph 5) agents promising to release Rivera-Diaz, in exchange for the location of the Webb Chapel apartment. Rivera-Diaz did not have consent authority having only been to the apartment for "<u>commercial transactions and</u>

7

<u>commercial purposes</u>," picking up drugs. It is difficult to believe that the agents did not understand the Fourth Amendment law, rules or did not obtain a search warrant.

The significance of this factor is that since Rivera-Diaz was tricked and lied to by agents to consent to showing the agents the location of the apartment, in exchange for his immediate release, his consent, could not be voluntary because it was obtained by fraud, deception, pressure and coercion. Furthermore his statement (See Exhibit 2, Paragraph 14) shows that he never provided any "<u>verbal or written</u> <u>consent to search the apartment.</u>" He lawfully did not have standing to provide consent and the agents did know this, or they should have known this in their capacity as agents, having used search warrants in the past.

Furthermore if the Government claims again, as they mentioned in the sentencing hearing transcripts that Rivera-Diaz somehow had authority to consent to a search of the apartment, and they somehow neglected to obtain a signed consent form, even implying Rivera-Diaz could have granted consent fails, "because consent is invalid if it is coerced, either explicitly or implicitly," see; <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 228 S. Ct. 2041, 2048, 36 L. Ed. 2d 854 (1973). Coercion is clearly a factor if consent is, "granted only in submission to a claim of lawful authority." Id. at 233, 93 S. Ct. at 2501. <u>United States v. Gomez-Diaz</u>, 712 F. 2d 949, 951 (5th Cir. 1983).

The burden to establish voluntary consent to search rests with the Government who failed to get a signed consent form and failed to understand that Rivera-Diaz did not have authority to consent. If somehow the Court finds that the Government's consent was somehow remarkably valid, that valid consent if hypothetically were obtained would also fail miserably the Six Factors test adopted and used in the Fifth Circuit in thousands of cases.

The Fifth Circuit uses Six Key Factors when looking at warrantless consent searches. In this case Movant's argument, the fact is the records testimony of agent Brian Finney, states that Rivera-Diaz gave consent to search the Webb Chapel apartment. See direct examination of agent Brian Finney by Ms. Lederman (See Sentencing Hearing Transcripts Page 12, Lines 12, 13, 14 and 15). Yet the affidavit statement of Rivera-Diaz states the facts entirely different that he did not give consent. To resolve this issue may require further evidence and an evidentiary hearing but regardless of that probable solution the Government still needs to overcome the list of Six Key Factors used by the Fifth Circuit and secondly why they did not get a signed consent form, considering one of their other defenses to justify the illegal and warrantless search is that, the agents somehow after arresting and

interviewed Rivera-Diaz and promising to release him, somehow conclusively thought
he lived at the apartment and had authority over it, because that based upon the
record is conclusively, simply impossible for the agents to assume. "Warrantless
searches of a person's home are presumptively unreasonable unless the person con-
sents, or unless probable cause and exigent circumstances justify the search."
United States v. Gomez-Moreno, 479 F. 3d 350, 354 (5th Cir. 2007)(citing United
States v. Jones, 239 F. 3d 716, 719 (5th Cir. 2001)). "The burden is on the Govern-
ment to establish circumstances justifying a warrantless search." "To be valid,
consent to search must be free and voluntary." United States v. Kellet, 981 F. 2d
1464, 1470 (5th Cir. 1993)(quoting United States v. Olivier-Becerril, 861 F. 2d
424, 425 (1988)). (Internal quotation marks omitted). "The voluntariness of con-
sent is 'a question of fact to be determined from the totality of all circum-
stances'." (Quoting Schneckloth v. Bustamonte).

The Fifth Circuit Six Key Factors to determine whether consent is voluntary:

(1) The voluntariness of the defendant's custodial status; (2) the presence of
coercive police procedures; (3) the extent and level of the defendant's cooperation
with the police; (4) the defendant's awareness of his right to refuse consent;
(5) the defendant's education and intelligence; and (6) the defendant's belief
that no incriminating evidence will be found. Olivier-Beceriil, 861 F. 2d at 426
(citing United States v. Galberth, 846 F. 2d 983, 987 (5th Cir. 1988)). "Although
all of the above factors are highly relevant, no one of the Six Factors is dis-
positive or controlling of the voluntariness issue." Galberth, 846 F. 2d at 987.

Every single factor of the Six guideline rules against the Government's claim of
voluntary consent. Plus the record all pushes against the Government agents volun-
tary consent statements and as stated above police used coercive procedure to have
Rivera-Diaz consent to search. (See Exhibit 2, Paragraphs 4, 5, 6, 7, 8 and 9).

Taking this one step further Movant's PSR also somewhat helpful and provides the
following evidence:

i) After being arrested, "a search of Rivera-Diaz revealed a key along with other
personal items." (See PSR Paragraph 9, Line 1).

ii) "Rivera-Diaz stated he picked up the methamphetamine found in Ixta-Urena's
vehicle from this apartment." (See PSR Paragraph 9, Lines 4 and 5).

iii) "Ixta-Urena provided Rivera-Diaz with the key to the Webb Chapel apartment one
week prior. He reported the apartment was normally occupied by a Hispanic male
whom he did not know." (See PSR Paragraph 10, Lines 5, 6 and 7).

Two significant facts come out of this part of the PSR investigation that could be addressed in an evidentiary hearing. They are; (1) If Ixta-Urena provided Rivera-Diaz with the key, why did the agents fail to ask for her consent to search the apartment, and (2) the record confirms a second male other than Movant who was there, when the visits to the apartment by Rivera-Diaz to pick up drugs that all took place befeore Movant came to the city of Dallas.

iv) Rivera-Diaz, lived with his Aunt in North Richland Hills. This confirms he did not stay in the Webb Chapel apartment. (See PSR Paragraph 9, Line 9), "upon arrival, he lived with Ixta-Urena at her house."

### III. JURISDICTION

Pursuant to 28 U.S.C. § 2255, "[a] prisoner in custody under sentence of a Court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States,...or is otherwise subject to collateral attack, may move the Court which imposed sentence to vacate, set aside, or correct sentence." Movant so moves this Court on grounds that he was denied the effective assistance of counsel when former counsel failed to move to suppress the evidence obtained during the illegal warrantless search of the apartment where Movant was found and arrested. Movant insists that the motion would have been successful and that the evidence would would have been suppressed. While possible, it would be unlikely the Government would be able to continue its prosecution after suppression of the evidence. Furthermore, Movant would not have entered into a plea of guilty had he been properly advised that the evidence obtained from the illegal search of the apartment should have been suppressed.

### IV. GROUNDS FOR RELIEF

A. GROUND ONE

Movant suffered a Fourth Amendment violation due to the ineffective assistance of counsel for failure to investigate the Government's illegal warrantless search and seizure.

Movant as described within this motion, was a victim of ineffective assistance of counsel, counsel's failure to advice and investigate the facts of his arrest related to a Meritorious Fourth Amendment Illegal Warrantless Search and entry of a home where Movant having arrived less than 48 hours earlier, was an overnight guest. Had counsel investigated the circumstances of the warrantless entry of the apartment the investigation would have revealed that the agents did not have consent from anyone or even a probable cause to burst into the apartment where Movant was

an overnight guest. Movant's counsel's failure to litigate a Fourth Amendment
claim competently is the principal allegation. Movant has also prove that his
Fourth Amendment claim is Meritorious. As a result Movant's defaulted Fourth
Amendment claim is one element of proof of his Sixth Amendment claim. Movant
was never informed, advice or even told of his Fourth Amendment Rights much less
of a motion to suppress all the evidence found inside the apartment. Therefore,
had Movant been informed by counsel of his Rights he would have decided to go for
the suppression of the evidence which would have resulted in a complete acquittal.

DEA agents' illegal warrantless search of the apartment where Movant was an over-
night guest violated the Fourth Amendment, counsel's failure to suppress the
fruits of the illegal warrantless search constitutes ineffective assistance of
counsel, and Movant's judgment should be vacated.

Movant, as a result of counsel's errors and deficient performance, received an
extraordinary sentence that he was not guilty of. He was clearly as the record
confirms, an overnight guest at a location where DEA agents entered and found drugs.
The record confirms that Movant had only arrived in Dallas less than 48 hours
before he was arrested during the raid, and there was another unknown male who
occuppied the apartment and was there for weeks even months before Movant arrived
at the Dallas apartment. This "unknown Hispanic male" has never been identified or
found, yet the record seems to on occassion, imply falsely, that the unknown His-
panic male was infact Movant. The evidence in both the record and the Memorandum
proves beyond any doubt, that the assumption or claim, that Movant was, is infact
100% in error, and not supported by the record.

On October 12, 2018, Movant was sentenced to 262 months in custody, due to the
evidence found within the apartment by the illegal warrantless search and seizure
of the agents, and by the ineffective assistance of former counsel, who refused to
even consider the investigation of the illegal and warrantless search claiming
falsely and negligently, that Movant's only option was to plead guilty, this was
clearly attorney's error, because his lawyer failed to advice or investigate the
facts of his arrest related to a Meritorious Fourth Amendment illegal warrantless
search. He also received five years of supervision after his release and although
a resident with family in the United States, he will face deportation, in April 11,
2037, when he is released.

Movant was not told or advice about the options to suppress his presence in the
home or the drugs found hidden in the home. This obvious Fourth Amendment claim
had it been pursued by counsel, would more likely than not, resulted in his acquittal
at trial for certain. There is a reasonable and logical probable outcome of success

11

when a warrantless search of a home takes place, especially when a search warrant could have been requested but was not by the agents. Without the evidence in the apartment Movant has no connection to the conspiracy charge he plead guilty to. Without the apartment search and seizure there was no feasible or evidentiary process for agents to connect Movant to the charges and to obtain a conviction much less an agreement to plead guilty. This ineffectiveness of counsel resulted in an unintelligent and involuntary plea process. It also nulifies the plea to the Court as when Movant made the plea, his counsel had voided her duty by not having properly informing or protecting him, the result of this broken process was a complete miscarriage of justice.

DEA agents on March 28, 2018, (day one of this case), received information from an unknown confidential source, claiming to receive methamphetamine from a person identified as, "Viejoto" who is in Mexico. Through this relationship the "CS" arranges for an undercover agent (UA), to purchase meth from "Viejoto." See PSR Page 3, Paragraph 5.

Undisputed witness testimony at the sentencing hearing on October 12, 2018, plus Exhibits presented; (vehicle registration, vehicle inspection, liability insurance card all of them from San Antonio), see Sentencing Hearing Transcripts Testimony Page 10, Lines 10 and 11, of Ms. Laura Rodriguez, Movant's sister; confirms Movant for two weeks was with his sister and family prior to the arrest, in a town called Cibolo, North of San Antonio, Texas roughly five hours drive distance from the Dallas home where the arrest took place.

There is no evidence connecting Movant to both the others who were arrested, nor to the location of the arrest (an apartment at 9765 Webb Chapel Road, Apt. # 2014, located in Dallas, Texas), until he arrives there on April 2, 2018, at 10 pm after driving from Cibolo, Texas.

On April 3, 2018, the petitioner spends the day looking for employment. He also purchases a blow up mattress, food and other items, toiletries and returns to the apartment.

On the morning of April 4, 2018, the day of the arrest, Movant spent the day driving around looking for work and potential locations (residential areas), where he could move to in the future. (See Affidavit Exhibit 1, Paragraph 19).

At 7pm the evening of April 4, 2018, approximately 15 heavily armed agents with assault rifles entered the apartment as Movant came out of the bathroom an agent pressing the assault rifle barrel to his face pushed him to the ground.

The agents did not knock or announce they were coming into the home, they did not have a search warrant, and they did not read Movant (although handcuffed and arrested), any Miranda warnings or statements.

Upon the illegal and warrantless search, the agents found methamphetamine hidden in a bedroom closet, and cell phones that did not belong to Movant (See PSR Paragraph 11). Agents also found Movant's luggage, clothes, toiletries, keys to his car, and the blow up mattress he had purchased that was set up in the living room where he slept, while Movant sat handcuffed and arrested, the agents disposed of liquids and some obvious unknown by flushing them down drains in the apartment.

On May 25, 2018, Movant, without any knowledge of the option to suppress every piece of evidence against him, was instructed by counsel that the only option he had was to plead guilty.

THE FAILURE TO KNOCK AND ANNOUNCE POLICE PRESENCE

The Fourth Amendment encompasses the right to be free from excessive force in addition to the right to be free from an arrest made unlawful by the absence of probable cause.

When police entered the apartment, they did so silently, and when the defendant came out of the bathroom, he was greeted by an assault rifle barrel being pushed into the skin of his cheek, and an overwhelming police presence. It is undisputed that Movant was both seized and injured when agents pointed a firearm at him. "An officer seizes a person where he, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Flores v. City of Palacios, 381 F. 3d at 396 (5th Cir. 2004)(citing Terry v. Ohio, 392 U.S. 1, 19n. 16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). When the lead agent of the group, placed the barrel of the assault rifle on Movant's face, he clearly restrained his liberty through physical force and show of authority. See Bazan v. Hidalgo County, 246 F. 3d at 490 (5th Cir. 2001). ("[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.") (Quoting Tennessee v. Garner, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L. Ed. 2d (1985)).

AGENTS ENTRY INTO THE PROPERTY WITHOUT KNOCKING AND ANNOUNCING THEIR PRESENCE VIOLATED MOVANT'S FOURTH AMENDMENT RIGHTS AND WAS CLEARLY UNREASONABLE UNDER ESTABLISHED LAW.

Movant additionally argues that, even if somehow the agents were not objectively unreasonable in entering the apartment without a warrant, failure to knock and announce before doing so violated the Fourth Amendment. The Supreme Court has noted that "[t]he common-law principle that law enforcement officers must announce their

13

presence and provide residents an opportunity to open the door is an ancient one." Hudson v. Michigan, 547 U.S. 586, 589 (2006)(citing Wilson v. Arkansas, 514 U.S. 927, 931-32 (1995)). In 1995, the Supreme Court held explicitly that his ancient principle "is an element of the reasonableness inquiry under the Fourth Amendment." Wilson, 512 U.S. at 934. Accordingly, Movant's argument that the Government's entry was unlawful because they failed to knock and announce successfully states a Consti- tutional Claim. Due to the silent entry, and failure to ask Movant for consent and agents not giving him an opportunity to talk because he was placed under arrest immediately the agents actions were objectively unreasonable under clearly estab- lished law.

While there are exceptions to the knock and announce rule, the Supreme Court has held that, in order to justify a "no-knock" entry, "the police must have a reason- able suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards v. Wisconsin, 520 U.S. 385, 394 (1997). The Fifth Circuit has explicitly ruled that, even when warrantless entry is justified by exigent circumstances, at least one of these factors must be present to excuse the no-knock entry. Trent v. Wade, 776 F. 3d at 382 (5th Cir. 2015).

Clearly there was no reason to believe there were weapons in the apartment as the agents asked Rivera-Diaz, and he confirmed there were none (See Exhibit 2). The agents simply should have sought a warrant, the fact that Rivera-Diaz had told them and stated "he observed additional narcotics at the apartment." (See PSR Para- graph 9). Rivera-Diaz also stated to the agents that for at least two weeks prior to the arrest, he has visited the apartment picking up large amount of drugs, before Movant's arrival in Dallas, confirms there was no risk of the destruction of the evidence. "Searches conducted outside the judicial process, without prior approval by Judge or Magistrate, are per se unreasonable under the Fourth Amendment [...] subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). The Supreme Court has long held the Constitution expresses a preference for searches, seizures, and arrests to be conducted pursuant to a lawfully executed warrant. See Mincey v. Arizona, 437 U.S. 385 (1978). Such a warrant ensures that the inferences to support a search are "drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." Johnson v. United States, 333 U.S. 10, 14 (1948).

Assuming, that the DEA agents had a reasonable suspicion that drugs were going to be destroy in the apartment, agents should have seek for a warrant as they had ample time to do so. The apartment was in complete control of the agents, Movant was in the bathroom and was not aware of their presence. It would have been little trouble for the DEA agents to obtain the search warrant. Instead, the DEA agents performed a warrantless search of the apartment in violation of the prescriptions of the Fourth Amendment.

Movant had Constitutional Protection Rights that he did not know existed. These Constitutional Protection Rights, his attorney was required by the Sixth Amendment to know, to investigate and to exercise, to the benefit of her client, yet counsel did nothing of the sort. Movant suffered as a result of his former counsel's in-effectiveness not only were his Fourth and Sixth Amendment Rights violated his substancive Due Process Rights were also violated. Had Movant's counsel suppressed the illegal search, illegal entry and all evidence found, there could be no connnection of the defendant to the conspiracy.

Movant as stated in Exhibit 1, Paragraph 21, "his sworn under penalty of perjury statement," that he was never told about any type of Fourth Amendment Protections or for that matter, told that all evidence against him could and should have been suppressed. It is extremely clear, that counsel failed unconstitutionally to protect and assist Movant by not investigating the warrantless search of the apartment. Perhaps counsel did not understand the Fourth Amendment, perhaps it was inconvenient for appointed counsel, to spend time investigating the evidence and filing motions, or perhaps it was simply negligence of some sort.

Fundamental questions that this Memorandum asks the Court to consider are:
1) Who has the responsibility of explaining to the accused a viable defense option;
(2) is the accused capable of waiving a Constitutional Right or Protection, that he does not understand as a result of counsel's negligence or ineffective assist-ance, he may have? (3) is the accused responsible for knowing every aspect of the law and his Constitutional Rights during the prosecution process, or is the Sixth, Fourth and Fourteenth Amendment the attorneys responsibility to understand, and use to protect the accused? (4) is it possible and then Constitutionally permissible for the accused to waive a trial and Constitutional Rights unknowingly? (5) does the waiving of those rights make the plea process and the defendant's answers in Court to the Judge, intelligent, knowingly and voluntary obtained?

It is not Movant's responsibility to act as "counsel" to be  the effective attorney who's obligation rests with the understanding of the Strickland principals and the right to effective assistance of counsel. Can a neglegently advised defendant,

waive a Constitutional protection or group of Constitutional Protections, he does not know he has as a result of his attorney's negligence.

It is simply impossible to voluntarily waive intelligently a right that you do not know exists, when the only reason that the defendant does not know the Fourth Amendment is an option, is because of his or her attorneys ineffective assistance either for failure to investigate the facts, complete negligence, incompetence, or unfortunatelly deceit, misrepresentation, even deception where an attorney by preventing a defendant from acquiring information which would, affect his judgment of a specific transaction, that transaction was the guilty plea process, resulting in a complete miscarriage of justice. Furthermore Movant (See Exhibit 1, Paragraph 25), makes reference to the fact that he wanted to somehow, withdraw his guilty plea, although at the juncture in the proceedings, that option had expired. (Movant while in Direct Appeal process, wrote the Court to request a new attorney as it was very obvious that Ms. Lederman, whom had advised him wrongfully to plead guilty, would not on her own attempt to fix the errors of the involuntary plea. (See Exhbits 3, 4, 5, and 6, "letters to the Court," attached to this Memorandum)).

Clearly here in Movant's declaration (See Exhibit 1, Paragraph 33) he would have insisted on going to trial because if he had known the search and entry into the apartment were Constitutionally in violation of the Fourth Amendment, 100% illegal and that he also had standing as an overnight guest, and a Viable Meritorious option to suppress everything found, he would have, as would have any defendant properly advised in the same situation, insisted upon filing the suppression motion and going to trial.

Had there been a search warrant, a consent form signed, consent from an owner, a resident, or even had the agents knocked and announce their entry, the Government which has the duty of establishing consent (because they neglected to get a search warrant), could possibly have an argument with some small amount of merit. The Constitution clearly states they do not. At this juncture both the SixthAmendment and Due Process are activated because if the attorney did not file the motion to suppress the evidence due to lack of funding, or even attorney negligence the damages for not doing so remain as clear and overwhelming as Constitutional Injury to Movant. Thus the Court should order an evidentiary hearing to determined exactly why counsel failed to consider the obvious illegal warrantless search. Was it intentional error or was it clear negligence. Walker v. Johnston (1941), Smith v. O'Grady (1941), Wells v. United States (1943), Hawk v. Olson (1945) Quicksall v. Michigan (1950), Parker v. North Carolina (1970). These case laws support the arguments stated above.

B. GROUND TWO

<u>Counsel was ineffective for failure to file a motion to suppress the evidence
found inside the apartment</u>.

Counsel failed to file a motion to suppress the central evidence that was obtained
from a warrantless search and seizure. Counsel was informed by Movant of the lack
of a search warrant from the Government or consent from the resident of the home-
stead to enter the apartment. Movant was not aware of or even informed of a motion
to suppress all the evidence found inside the apartment due to the warrantless
entry and the violation of his Fourth Amendment Rights, had he been informed of
the motion to suppress he would not have pleaded guilty and would have insisted on
going to trial.

The two prong test of <u>Strickland v. Washington</u>, 466 U.S. at 668 (1984), requires a
petitioner to demonstrate, by a preponderance of the evidence that: 1) counsel's
performance fell below an objective standard of reasonableness; and 2) the deficient
performance prejudiced the defense. Id. at 688. In situations as the Court faces
here, there is another prong: the petitioner must demonstrate that there is a
reasonable likelihood of success of the motion to suppress. See <u>Kimmelman v.
Morrison</u>, 477 U.S. 365 (1986).

Counsel's performance must fall below an objective standard of reasonableness to
satisfy <u>Strickland</u>. The Supreme Court has "declined to articulate specific guide-
lines for appropiate attorney conduct and instead [has] emphasized that the proper
measure of attorney performance remains simply reasonableness under prevailing pro-
fessional norms." <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003)(quoting <u>Strickland</u>,
466 U.S. at 688)(internal quotation marks ommitted). The Court may dispose of the
claim if a defendant fails to carry his burden of proof on either the performance
or the prejudice prong. <u>Strickland</u>, 466 U.S. at 697. Because Counsel is presumed
to be competent, the burden rests on the movant to show a Constitutional violation.
<u>United States v. Cronic</u>, 466 U.S. 648, 658 (1984)(citing <u>Michel v. Louisiana</u>, 350
U.S. 91, 100-01 (1955)).

Failure to suppress evidence discovered through an illegal warrantless search is
objectively deficient performance. Counsel failed to suppress evidence discovered
through the illegal warrantless search of the apartment where Movant was found in.
Due to counsel's failure to suppress evidence discovered through the illegal warrant-
less search of the apartment, movant entered a plea of guilty. Movant would not have
entered a plea of guilty had the evidence discovered through the illegal warrant-
less search of the apartment been suppressed.

Failure to investigate the facts upon which the complaint was based for suppression issues clearly falls below an objective standard of reasonableness. Any reasonable attorney would have known upon an investigation of the facts that the evidence obtained through the unlawful search and seizure of Movant and the evidence found in the apartment should have been suppressed. Trial counsel never advised Movant that the evidence found in the apartment, the evidence used to indict him, could be suppressed. Trial counsel failed to investigate possible defenses or communicate with his client, two of the most essential obligations of an attorney. Because trial counsel for Movant failed to perform the most basic of functions as an attorney, such inaction amounts to performance failing below an objective standard of reasonableness.

In order for an attorney's deficient performance to amount to ineffective assistance of counsel, it must prejudice the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's erors, he would not have pleaded guilty and would have insisted on going to trial." Hill v.Lockhart, 474 U.S. 52, 59 (1985). The Fifth Circuit has held that in the plea context, Strickland requires the showing of a "'reasonable probability' that the result of the proceeding would have been different."

In this instance, had Movant known that the evidence should have been suppressed and made inadmissible at trial, there is more than a reasonable probability that he would not have pleaded guilty and would have insisted on going to trial. The Government relied on the inclusion of the evidence gathered from the illegal search and seizure of the apartment to indict and prosecute Movant. Had that evidence been made inadmissible, Movant would have insisted on going to trial. Had Movant known that evidence suppression was even an option or a defense strategy, he would have insisted upon pursuing the suppression issue and would have gone to trial. Because there is a reasonable probability that Movant would not have pleaded guilty had he been provided with information regarding the suppression of the evidence in his case, failure to provide said information prejudiced Movant.

As demonstrated above Movant has a reasonable likelihood of success on the merits of his Motion to Suppress. Movant's attorney's performance fell below an objective standard of reasonableness. This objectively unreasonable performance prejudice Movant. A motion to suppress has a reasonable likelihood of success on the merits. Thus, counsel's failure to investigate potential defenses, communicate with his client, and file a Motion to Suppress constitutes a violation of the Sixth Amendment right to counsel and warrants vacation of the judgment in this matter.

A further legal and prejudicial key factor that this motion will demonstrate for
the Court is that even negligence by counsel causing an involuntary plea process
is Constitutional Injury. As this Memorandum and Record of evidence supports, Movant
received misleading advice, or negligent advice and became unduly influenced as a
result to plead guilty. This is clear Constitutional Injury suffered by the defendant
as a result of former counsel's deficient and unconstitutional performance. Whether
this was a deliberate choice by counsel to save money, time and effort, or whether
by negligence the 262 months sentence was extraordinary and illegally obtained and
therefore cannot stand.

In the context of what took place leading to the involuntary and unintelligent guilty
plea of Movant, former counsel did know, or should have known in her capacity as a
criminal defence lawyer, The Fourth Amendment argument violations including that all
evidence against him and his very presence in the conspiracy, could have been and
quite possibly would have been suppressed, had former counsel, simply investigated
further after being told about the arrest and illegal entrance into the home, and
then filed a simple investigated suppression motion, challenging the illegal entry,
the lack of a warrant and the lack of any legal consent by a person authorized under
the law to provide consent.

It is true that even the most ethical but fatigued and overwhelmed defender with a
large case load is more apt to rely too heavily on plea bargaining and as a result,
will not spend the time and effort required to professionally investigate the critical
facts of a criminal case. This attorney's negligence can and does lead to wrongful
convictions as demonstrated by what took place in Movant's guilty plea. Had Movant
been informed by counsel that a suppression motion would have resulted in him being
exonerated, he would have for certain chose the trial option, yet ineffective assist-
ance of counsel deprived him of that choice and right.

The Constitution of the United States begins with a promise to "Secure the Blessings
of Liberty to Ourselves and Our Posterity," and is meant to prohibit both Federal
and States Governments from depriving a person of that liberty without "Due Process
of Law." Any involuntary or unintelligent plea, deprives the accused of his or her
rights, and Due Process; "U.S. Constitution." Preamble, Amendments V, XIV. It is
also very difficult to think of greater deprivations of liberty than being wrong-
fully convicted and sentenced as a result of ineffective legal advice, by counsel
who maybe unfortunately more interested in speed, than investigating and testing
effectively the prosecution case, it is clear that counsel is obligated by law to
fulfill their obligations under Strickland and the Sixth Amendment. "The Consti-
tutional rights of criminal defendants are granted to the innocent and the guilty
alike."

Movant's involuntary plea and the resulting tragic conviction, also offends the "Two Fold Aim" of our Justice System, "which is that guilt shall not escape nor innocent suffer." See, Berger v. United States, 295 U.S. 78, 88 (1935). Even with effective counsel its well known fact, that in our Justice System, the innocent do, infact, plead guilty. Fairness and truth-Finding are the ultimate imperatives within our "Justicies' Due Process Requirement."

Ineffective representation as defined by this motion, explained in Strickland v. Washington, Hill v. Lockhart, Kimmelman v. Morrison, and numerous other cases on this subject, helps to establish that pleas are no more reliable than trials. As this motion confirms, an uninformed innocent defendant is easily placed under too much pressure and is as a result, especially risk adverse to pleading guilty even though he may be actually innocent of the crime he pleads to. This ineffective assistance whether by deceit or even negligence created a breakdown in the adversarial justice process rendering the result unconstitutional.

This is an exceptional case where both ineffective assistance of counsel and prejudice are clearly established. As a result the Court will routinely grant relief when a guilty plea is induced by a lawyer's ignorance or misadvice. The plea of a criminal defendant, thus misinformed, maybe said to be both, involuntary and also unintelligently made. When counsel's Constitutional errors, has occasioned the entry of an involuntary and unintelligent guilty plea, the inevitable redress is an order striking the plea and/or the release of the prisoner. Clearly if an attorney's advice, conduct, errors and/or negligence, does not fall within the range of what competence demands of an attorney in all criminal cases, then the defendant may attack the "wrongfully obtained or involuntary-obtained, guilty plea."

The Supreme Court and the Fifth Circuit have both confirmed that a guilty plea must be a voluntary, knowing and intelligent act "done with sufficient awareness of the relevant circumstances and likely consequences." Brady v. United States, 397 U.S. 742, 748 (1970). Pleas are clearly involuntary when induced by threats, improper promises, deception, negligence or misrepresentation. See United States v. Amaya, 111 F. 3d 386, 389 (5th Cir. 1997). "A plea is invalid if the defendant does not understand the nature of the Constitutional protection that he is waiving or if he has such an incomplete understanding of the charges against him that his plea cannot stand as an admission of guilty." Jones v. Cain, 56 F. 3d 662, 666 (5th Cir. 1995)(citing Henderson v. Morgan, 426 U.S. 637, 645 n. 13, 96 S. Ct. 2253, 49 L. Ed. 2d 108 (1976)).

As previously stated Movant was not informed of his Constitutional Protection Rights. Thus, had suppression been attempted and successfully granted (as the

motions success is a clear possible outcome), Movant could have succeeded in a trial and would have for certain gone to trial. (See Exhibit 1, Paragraph 33).

The United States Supreme Court case of <u>Kimmelman v. Robinson</u>, 477 U.S. at 365; June 26, 1986, is also helpful in regards to Movant's claims, as it explains the fundamental rights of a petitioner, when defence counsel's failure, to make a timely suppression motion is the primary manifestation of incompetence and the source of prejudice advanced by Movant.

Several cases support the fact that a failure of counsel to file a suppression motion can support a claim of ineffective assistance of counsel. <u>Morris v. Thaler</u>, 425 Fed. Appx. 415 (5th Cir. 2011) stated that, "a petitioner was permitted to challenge his guilty plea as involuntary based upon ineffective assistance of counsel when his attorney failed to file a motion to suppress the central evidence in the prosecution's case." See, <u>United States v. Cavitt</u>, 550 F. 3d 430 (5th Cir. 2008)(petitioner could challenge guilty as involuntary based upon counsel's failure to file a motion to suppress). The record in this case clearly reveals that Movant's attorney failed to file a timely suppression motion, not due to any strategic considerations. Counsel's failure cannot be based on "strategy" but on counsel's lack of performance. A complete lack of pretrial preparation puts at risk both the defendant's right to an ample opportunity to meet the case of the prosecution and the reliability of the adversarial testing process.

Here in this case, Movant who is told to plead guilty and does so, not knowing that all the evidence in the apartment, including his presence there as an overnight guest, could have been and should have been suppressed. Counsel's misadvice and negligence is a complete miscarriage of justice, a wrongfully obtained plea and conviction.

The Sixth Amendment Right to effective assistance of counsel clearly "extends to the plea-bargaining process." <u>Lafler v. Cooper</u>, 566 U.S. 156, 162 (2012). Therefore, before deciding whether to plead or go to trial, a criminal defendant is entitled to "the effective assistance of competent counsel." <u>McMann v. Richardson</u>, 397 U.S. 759, 771 (1970). A guilty plea is "open to attack on the ground that counsel did not provide the defendant with 'Reasonably Competent Advice'." <u>Cuyller v. Sullivan</u>, 466 U.S. 335, 344 (1980). Why did Movant's former counsel forego the opportunity to suppress the illegal search of the apartment, and why did counsel not advice competently Movant of his Constitutional Right to suppress the illegal search, and all the evidence obtained through it?

In conclusion to the fact that a guilty plea cannot be voluntary or intelligently made when defence counsel fails to inform the defendant that he had a logical

suppression motion option, "a Meritorious Fourth Amendment Claim," also failed to investigate it and then, file a suppression motion "the contract with counsel to be effective" was broken by counsel for failing to effectively protect her client "Movant" or alternatively by negligence or even misrepresentation, failing to do what the Constitution guarantees, that being, to be Constitutionally effective counsel. This break in the contract occured before the plea was accepted by the Court.

A Constitutional valid guilty plea must be knowingly, voluntarily and intelligent made. <u>United States v. Hernandez</u>, 234 F. 3d 252, 254 (5th Cir. 2000). Yet in Movant's case it simply could not have been because if told by counsel there was an option to suppress all the evidence connecting him to his conviction, any defendant would insist on suppression and of course the trial option. As Movant's statement explains he would have insisted on going to trial had counsel explained the suppression option. Clearly suppression of the evidence in the conviction of Movant would lead any defendant to the trial decision. (See Exhibit 1).

<u>C. GROUND THREE</u>

<u>Movant received ineffective assistance of counsel when counsel failed to properly appraise him of the lack of investigation on Movant's defense strategy</u>.

Movant had explained and informed counsel with every detail information on what happened to the best of his recollection. At the same time Movant understood he needed additional factual information that could be used to substanciate his story. As a result Movant provided his counsel with the relevant facts and circumstances on how the warrantless search and seizure and the arrest took place, in light of such an investigation, Movant believed that counsel would have a better position to assess the case in his favor.

As previously indicated counsel did nothing of the sort nor inform Movant about the lack of investigate findings. Instead he was lead to believe that by pleading guilty he was going to get a lesser sentence. In his mind Movant assumed that his counsel was working on every facet of the investigation so he was confident to assure the Court that he had everything from his counsel.

The only obvious choice for Movant told by former counsel was to proceed to plead guilty and to take his chances because he had ask her to see the discovery and she stated "they have nothing against you other than the drugs that were found inside the apartment." Clearly Movant's counsel failed to seek any discovery from the prosecution, and therefore was not aware of what the DEA agents had seized from the apartment. After the DEA agent had testified regarding the seizure on the sentencing hearing day counsel moved to cross-examine the agent, she asked him "Did--at some point in time prior to today, did you indicate that there were

phones, and he was not on the phone, but you found a cell phone, in the apartment
that had had that phone number prior to your arrival?" to which the agent (somehow
disoriented about the question) reply to her "can you ask me the question again,
please" to which Ms. Lederman avoided and went on to ask the agent a different
question because she knew that she had failed to seek or investigate the discovery
so she was not familiar with the relevant facts and evidence as to what was found
inside the apartment other than the drugs, because according to the DEA's agent
they found "one phone" that belong to Movant, and counsel had failed to inves-
tigate this. Had counsel done the proper research she would have found out that the
cell phone the agent was referring to was not Movant's cell phone and this would
have excluded him from the conspiracy. "A reasonable attorney has an obligation to
research relevant facts and law, or make an informed decision that certain avenues
will not prove fruitful." United States v. Williamson, 183 F. 3d 458, 462 (5th Cir.
1999). "In other words, counsel has a duty to make reasonable investigations or to
make a reasonable decision that makes particular investigations unnecessary."
Strickland, 466 U.S. at 691. At minimun, an attorney should be familiar with the
facts and law relevant to his client's case.

Movant's counsel was deficient because she did not keep him abreast of legal devel-
opments related to his case which would have revealed a solid and Meritorious
Fourth Amendment Claim and prove as well that the cell phone was not infact his.

As previously stated the right to the effective assistance of counsel at trial is
a fundamental and bedrock principal in our Justice System. It is deemed as an
"OBVIOUS TRUTH," the idea that "any person haled into to Court, who is too poor to
hire a lawyer, cannot be assured a fair trial unless counsel is provided for him."
Gideon v. Wainwright, 372 U.S. 335, 344 (1963). Defense counsel must also test the
prosecution's case to ensure that the proceedings serve the function of adjudicating
guilt or innocence, while also protecting the rights of the person charge. See
Powell v. Alabama, 287 U.S. 45, 68-69 (1932)("The defendant requires the guiding
hand of counsel at every step in the proceedings against him. Without it, though
he be not guilty, he faces the danger of conviction because he does not know how
to establish his innocence.") As the record clearly shows Movant's counsel was both
deficient and Constitutionally ineffective, furthermore if defense counsel fails to
provide competent advice, fails to investigate or inform his or her client that a
motion could result in a total acquittal of the charges, is it the defendant that
should have known the defence options and the complexities of law or the possible
motion options that exist, or is the advice given to the defendant so flawed that
the advice is both ineffective, and as a result, open to attack by the defendant
and redress or vacation by the Court.

23

D. GROUND FOUR

Counsel was ineffective for her failure to object to hearsay statements

Counsel's failure to object to hearsay statements, seek a plea agreement and advice Movant to agree to false or hearsay statements read by the Judge as part of the plea colloquy. Counsel's advice to not worry about hearsay and agreed to plead guilty to it, was Constitutionally and procedurally unacceptable.

Due to counsel's negligence and failure to provide the very basic attorney's serv-ices a plea agreement was never even sought out. Therefore because of counsel's in-competence Movant's defense was left derelict and at the mercy of the prosecutor.

Counsel also failed to object to damaging hearsay statements given by the Govern-ment agent in the sentencing hearing and the hearsay evidence given, was prejudicial. The result thereof, created a false narrative for the Court's consideration and this was both prejudicial and negligent representation of Movant.

During the arraignment hearing on May 25, 2018, Movant is disagreeing with the claims against him and an exchange occurs that disrupts the plea process. Here the exchange between Movant and his counsel show clearly a disagreement in the "Court's record of events," yet at this point to continue down "former counsel plead out plan," Ms. Lederman states to Movant; "DO NOT WORRY THATS ALL HEARSAY," counsel instructing Movant to agree to false or hearsay statements is simply unacceptable and is of course, Constitutional prejudicial. As the record supports, there is a potential claim. Counsel's advice to not worry about hearsay and agree to plead guilty to it, was Constitutionally unacceptable, as it further tainted the already unintelligent and involuntary plea process, that counsel's ineffective assistance created. (See rearraignment transcripts Page 29, Lines 22-25, Page 30, Lines 1-8). Had counsel done the proper objections to the hearsay statements read by the Judge and the DEA's agent, Movant would have gotten a less harsh sentence.
Rios-Delgado v. United States, 117 F. Supp 2d 581, 588-89 (W.D. Tex. 2000). In Rios-Delgado, the District Court concluded that the attorney's "silence reflected nothing more than a failure to investigate the relevant facts and law that would have given her a strategy." 117 F. Supp 2d at 591.

The Constitutionally unfortunate result that, innocent defendants can easily received misleading advice or "passive misrepresentation" (1901), meaning "the acts of remaining silent under circumstances that makes the silence seem to support a false statements validity." This attorneys misrepresentation by silence is also "the act of leading a defendant to believe something that is not true, without actually making any false statements."

V. PRAYER FOR RELIEF

There are certain cases where Constitutional Injury clearly warrants relief and this is one of those rare and exceptional cases.

In order although to be entitled to a hearing, a petitioner must only show Independent Indicia and that a factual dispute, if resolved in Movant's favor, would entitle him to relief Movant's allegations must be more than merely conclusory allegations of events, they must be supported by both case law and specific facts.

Movant's Meritorious Fourth Amendment argument, it is abundantly clear that the DEA's agents violated his Fourth Amendment Rights when they enter the apartment without a warrant. Movant's counsel failed to file a motion to suppress this illegally obtained evidence or to discuss it with Movant, and this failure to investigate and communicate prejudiced Movant. Had counsel filed the motion to suppress there is a reasonable likelihood the outcome of the proceeding would have been different.

Movant, respectfully asks this Court to review the facts supported by the record and either vacate Movant's sentence and wrongful conviction, or alternatively order an evidentiary hearing to resolve his issue contained within, with the effective assistance of counsel.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.


Executed on   July  29, 2020.                    JUAN JIMENEZ NAVA
                                                 _____
                                                 Juan Jimenez-Nava

JUAN JIMENEZ-NAVA
REG. NO. 57033-177
FCI OAKDALE II
P.O. BOX 5010
OAKDALE, LA. 71463


<u>AFFIDAVIT</u>


1. My name is Juan Jimenez-Nava also known as Cesar Edmundo Murguia. I was born on February 27, 1975. I have 4 children and been married for 22 years.

2. I was sentenced to 262 months on October 12, 2018. I plead guilty instead of going to trial because the advice given to me by my former counsel, was mis-leading and ineffective.

3. I was arrested because I was an overnight guest in an apartment, where I had arrived on April 2, 2018. At approximately 7pm on April 4, 2018, several heavily armed DEA or Government Agents, obtained a key to the apartment, and entered the apartment without knocking or making any announcement they were in the apartment.

4. On April 4, 2018, around 5pm after driving around the city of Dallas looking for employment on the way back to the apartment I stopped at a barber shop to get a haircut.

5. Once in the apartment I headed to the bathroom as I was getting ready to jump in the shower I decided to trim my beard before taking the shower.

6. When I came out of the bathroom I was confronted by an agent, who placed the barrel of an assault rifle on my right cheek.

7. I never saw a warrant or was ask for my consent to enter.

8. The agent pushed me to the floor and then handcuffed me with my hands behind my back.

9. This took place on the living room area then he helped me up and placed me on the floor of the dining room facing down.

10. After a few minutes they helped me up again and had me sat on a plastic chair in between the dining room and the living room, at that moment I noticed the agents dumping unknown liquids down drains in the kitchen sink.

EXHIBIT 1

1

EXHIBIT 1

mattress.

12. During all this time I was only wearing my boxers and a t-shirt.

13. Then a DEA lady in her fifties helped me to put my pants back on.

14. During all this time I always remained handcuffed with my hands behind my back.

15. They never read me my Miranda Rights.

16. I was with my family and sister for two weeks before driving to Dallas from Cibolo, Texas. The drive took place on April 2, 2018, and it took me about 5 hours to complete.

17. My sister testified to this on the stand as a witness before the Court.

18. I spent April 3, 2018, looking for employment, shopping and purchased a blow up mattress to sleeep on at the apartment and some food, coffee and toliletries.

19. Also on April 4, 2018, I spent the day driving around looking for work and potential locations where I could move to in the future.

20. The agents found my luggage, clothes, toiletries and the blow up mattress.

21. On May 25, 2018, without any knowledge or any advice, even consideration by counsel or investigation by counsel, I was instructed to plead guilty and did. I was never advised by counsel about my Fourth Amendment Rights despite explaining to her in detail all the events that took place with respect to the illegal and warrantless entry into the apartment.

22. I told my former counsel Ms. Lederman that the agents never read me my Miranda Rights or even asked my permission to search the apartment as I was there alone when they came into the apartment and she stated "its okay they're FEDS they can do whatever they want."

23. During the plea process I was also wrongfully advice by my counsel to just agree with what the Judge stated. Ms. Lederman told me when I had real concerns about agreeing with what the Judge was reading not to worry, she stated, "do not worry that's all hearsay." This was wrong and defective advice.

2

24. On arrival at FCI OAKDALE II, I learned that I had Constitutional Rights and that my Constitutional Rights were violated.

25. I began writing to the Court of Appeals because at this point I was still in the Direct Appeal Process and those letters are listed as Exhibits 3, 4, 5 and 6, and are attached to the Memorandum in Support of the 2255. At this point I wanted to somehow withdraw my guilty plea.

26. At this point I became aware that I had Constitutional Rights, that my plea was unintelligently made and involuntary because I did not have an assistance from counsel or consideration of my rights as an overnight guest to suppress the search, entirely and everything found within the apartment, all of which make up the case against me and my involuntary guilty plea.

27. There is no doubt that I received negligent misadvice from Ms. Lederman and this advice resulted in my wrongful conviction and 262 months sentence.

28. Furthermore Ms. Lederman made a mistake on Appeal that impacted my chance at any relief. She failed to have the Court or request the Court to explain its ruling against the "minimal role adjustment," this impacted the Court of Appeals ruling and was ineffective and negligent.

29. I believe I have suffered a Constitutional Injury due to counsel's ineffective assistance.

30. With what I have learned researching case law and speaking with inmates about the Fourth Amendment Rights I had, I would have for certain insisted that any lawyer working for me file a suppression motion and challenge the warrantless illegal entry and search of the apartment. Further to this whole issue, is the fact that counsel not only should have investigated and informed me of my rights counsel should have taken time to consider any viable defence.

31. Clearly all the case law supports the fact that when agents crossed the threshold of any home, residence or apartment without a warrant, the Fourth Amendment protection come into place.

32. Clearly had Ms. Lederman after I told her about the arrest and events, should have explained all the options I had, including the Fourth Amendment.

33. Had I had, proper advice, I would have for certain gone to trial and suppressed everything that took place, the warrantless entry, search, arrest and all the

EXHIBIT 1

34. I have filed my 2255 Motion, the Exhibits, documents, evidence and Memorandum in Support, because I received misleading advice. Counsel did know, or should have known in her capacity as a criminal lawyer that Constitutional Violations took place and she should have investigated and informed me of options that I had to fight those issues.

35. As a result of her ineffective advice, I involuntarily and unknowingly plead guilty, I wish I had somehow know about my rights, I would have for certain filed a motion to suppress and would have gone to a trial jury.

36. I have spent months researching the issues in my case. I was told from the begining bad advice that affected the entire process and all the events including my unintelligently made plea process. I ask that this Honorable Court to consider these facts and the record as both support my Constitutional Injury as a result of my ineffective assistance of counsel.

I declare ( or certify, verify, or state ) under penalty of perjury that the foregoing is true and correct.

Executed on June 10, 2020.

JUAN JIMENEZ-NAVA
Juan Jimenez-Nava

EXHIBIT 1

4

HECTOR RIVERA-DIAZ
FED. ID. 57035-177
FCI OAKDALE II
P.O. BOX 5010
OAKDALE, LA. 71463

March 03, 2020.

1) My name is Hector Rivera-Diaz, I was born in Apatzingan, Michoacan on November 8, 1998 my spouse is Maria del Carmen Manriquez and we have a 21 month old daughter her name is Ivana Rivera-Manriquez, I have 2 sisters their names are Cataleya and Dayana 2 and 5 years of age. I was raised by my mother only her name is Norma Rivera-Diaz.

2) I had only come to the United States to find work and live a normal life, when I could not get work my Aunt Rosa Elvia Ixta-Urena offered me a job working with her.

3) During all this time, about 2 weeks I lived with my Aunt at her house in North Richland Hills.

4) I was with my Aunt on April 4, 2018, when She and I were arrested by agents. Once I was handcuffed, the agents searched me and found a door key to the Webb Chapel apartment. The arrest took place in a parking lot at La Fiesta grocery store.

5) After the arrest the agents told me they would let me go. That I could go back to Mexico, so as a result, I agreed to tell them where the Webb Chapel apartment was located, because I believed they really would let me go back to Mexico. I did not know anything about my Miranda rights, or my right to remain silent and I was intimidated and scared by them.

6) When the arrest took place approximately 15 agents swarmed around the vehicle with guns drawn. They threw me to the ground after pulling me from the passenger seat of the vehicle. After I was handcuffed and searched, the agents kept asking me questions, and I did not understand the fact that I would get a larger sentence for just doing what I did, and I did not know my rights or any options I had to not talk to the agents.

EXHIBIT 2

1

7) I have completed the 8th grade in Mexico and the arrest was so incredibly stressful and overwhelming, that I even asked one agent if I could call my mother in Mexico to find out what to do.

8) During the long and intimidating interrogation after my arrest, I felt overwhelmed, pressured and that I had to cooperate. When I was intimidated the agents use this to trick me with the promise that they would let me go. I thought they would, I thought that I would be simply let go to return to my mother and family in Mexico.

9) About 30 to 60 minutes after the arrest, I agreed to show the agents to the apartment, because again they told me I could go back home to Mexico that day. I was foolish and naive to believe this but I did.

They drove me to the apartment and we pulled infront with a clear view of the windows and I pointed out the apartment. As we did this, no one from inside the apartment looked out or noticed me or the agents. The agents were trying to also not be noticed.

10) One of the questions I was asked by the agents was about guns or weapons and also who was in the apartment.

11) I told them there was at least one male, could be two males, as there was one male sleeping on a blown up mattress in the living room. I have since gotten to know that male as Juan jimenez-Nava, because we were locked up together during the pre-plea process, in pre-trial at Fort Worth, Texas, and now he is also in FCI OAKDALE II, and I can say with 100% certainly that Juan Jimenez-Nava, was not the unknown male who was at the Webb Chapel apartment, when I went there to pick up the two previous loads of drugs, one of 5 kilograms of meth-amphetamine and the second one of 2 kilograms of methamphetamine.

12) When I was arrested with my Aunt they separated us, and I have no idea if they asked my Aunt for permission to search the apartment as it was my Aunt who gave me the key. I did tell the agents this when they arrested me and that the key was to the front door of the apartment.

13) As for guns and weapons, I told the agents I had never seen a gun or any weapons in the apartment at all. As far as I knew there were no guns at the apartment, nor any weapons.

EXHIBIT 2

2

knowingly sign any consent to search forms, and I explained to them, I only
went there to quickly pick up drugs, and that was my only reason at the
apartment.

15) I would go to the apartment with my Aunt Rosa Elvia Ixta-Urena who waited
outside in the vehicle, I entered the apartment and another hispanic male,
who I did not know, and who was not Juan Jimenez-Nava would provide me the
intended amount of methamphetamine.

I declare (or certify, verify, or state) under penalty of perjury that the
foregoing is true and correct.

Executed on March 03, 2020.

Hector Rueda Diaz
Hector Rivera-Diaz

EXHIBIT 2

3

FED. ID. 57035-177
FCI OAKDALE II
P.O. BOX 5010
OAKDALE, LA. 71463

Marzo 03, 2020.

1) Mi nombre es Hector Rivera-Diaz naci en Apatzingan, Michoacan el dia 8 de Noviembre de 1998, mi esposa es Maria del Carmen Manriquez con quien tengo una hija de 21 meses de nombre Ivana Rivera-Manriquez, tengo 2 hermanas de nombres Cataleya y Dayana de 2 y 5 anos de edad, fui criado por mi Mama solamente su nombre es Norma Rivera-Diaz.

2) Yo habia venido a los Estados Unidos a encontrar un trabajo y vivir una vida normal. Cuando no pude encontrar trabajo mi Tia Rosa Elvia Ixta-Urena me ofrecio trabajo, trabajando con ella.

3) Durante este tiempo, cerca de 2 semanas vivi con ella en su casa en la ciudad de North Richland Hills.

4) Yo estaba con mi Tia en Abril 4 del 2018, cuando ella y yo fuimos arresta-dos por unos agentes. Una vez que me habian esposado, los agentes me revisaron el cuerpo y encontraron una llave de la puerta del apartamento de la calle Webb Chapel Rd., el lugar donde me arrestaron fue en el estacionamiento de una tienda llamada La Fiesta.

5) Despues del arresto los agentes me dijeron que me dejarian ir libre, para que me pudiera regresar a Mexico, por lo cual yo accedi a decirles la ubicacion del apartamento de la calle Webb Chapel Rd., porque yo en verdad les crei a los agentes que me dejarian ir libre para regresarme a Mexico. Yo desconocia sobre los derechos Miranda, o mi derecho a mantenerme callado y estaba siendo intimidado y espantado por ellos.

6) Cuando me arrestaron aproximadamente 15 agentes rodearon el vehiculo y apuntandome con sus armas. Luego ellos me sacaron a jalones del lado del pasajero y me tiraron al piso. Despues de que me esposaron y me revisaron el cuerpo, los agentes me seguian haciendo preguntas, y yo no entendia el hecho

EXHIBIT 2

1

...de que me hubieran un enterado de me agentes o mas tardes y yo
no sabia de mis derechos o algunas de las opciones que yo tenia de no hablar
con los agentes.

7) Yo estudie hasta 2do grado de secundaria en Mexico y el arresto fue dema-
siado estresante y abrumador a tal grado que le pregunte a uno de los agentes
que si podia hablarle por telefono a mi Mama a Mexico para que ella investigara
que hacer.

8) Durante el largo e intimidante interrogatorio despues de mi arresto me
senti abrumado, presionado y que yo tenia que cooperar con ellos. Cuando los
agentes me intimidaron usaron el truco y la promesa que me dejarian ir libre.
Pense que si lo harian, pense que simplemente me dejarian ir para regresar a
mi Mama y mi familia en Mexico. Tambien les pedi de favor usar un telefono
para hablarle a mi Mama para ver que se podia hacer, pero lo que en realidad
paso fue que los agentes me forzaron, y me enganaron a que los llevara al
apartamento y yo no tenia entendimiento de las leyes o mis derechos aunque
tenga 19 anos de edad y sea nacido en Mexico, aun asi tenia el derecho de
simplemente esperar hasta que tuviera un abogado.

9) Cerca de 30 a 60 minutos despues de que me arrestaron yo accedi a ensenar-
les a los agentes donde quedaba el apartamento, porque una vez mas me dijeron
que me dejarian irme libre de regreso a Mexico ese dia. Yo fui tonto e
ingenuo en creerles esto pero confie en ellos.
Ellos me llevaron al apartamento y nos estacionamos enfrente de este, desde
donde podiamos ver claramente las ventanas y les senale cual era el aparta-
mento y mientras haciamos esto, nadie de adentro del apartamento nos obser-
vaba o se dio cuenta de que estabamos los agentes y yo afuera. Los agentes
tambien trataban de no ser vistos.

10) Una de las preguntas que me preguntaron los agentes fue que si habia
alguien y que si tenia armas dentro del apartamento.

11) Les dije que al menos habia un hombre o podria haber 2, porque habia un
colchon inflable en la sala del apartamento en cual se miraba que alguien
dormia en el. Apenas vine a saber que ese hombre es Juan Jimenez-Nava, porque
estuvimos juntos encerrados durante el proceso de la sentencia en Fort Worth,
Texas. Y ahora tambien estamos juntos en FCI OAKDALE II en LOUISIANA y puedo

EXHIBIT 2

decir con 100% de certeza que Juan Jimenez-Nava no era el hombre desconocido que estaba en el apartamento de la Webb Chapel Rd., cuando fui a recoger droga las dos veces anteriormente, una vez fueron 5 kgs y la segunda vez fueron 2 kgs de metanfetamina ambas veces.

12) Cuando fui arrestado con mi Tia Rosa Elvia Ixta-Urena nos separaron, y no tengo idea si le preguntaron a mi Tia por permiso para entrar y revisar el apartamento ya que mi Tia fue la que me dio la llave. Yo si les dije a los agentes esto cuando me arrestaron y que la llave era para la puerta de entrada del apartamento.

13) Referente a armas o pistolas, yo les dije a los agentes que yo nunca habia visto ninguna pistola o armas en el apartamento. Hasta donde yo sabia no habia pistolas dentro del apartamento o ningun tipo de armas.

14) Yo nunca les di consentimiento a los agentes para que entraran al apartamento. Yo nunca firme ningun consentimiento o formulario dandoles permiso para entrar, y yo les explique a ellos que yo solo iba al apartamento para recoger droga y siempre entraba y salia rapido, y esa era mi unica razon por la cual iba al apartamento.

15) Yo iba al apartamento con mi Tia Rosa Elvia Ixta-Urena quien siempre me esperaba afuera en el carro, yo entraba al apartamento y otro hombre hispano, al cual yo no conocia, y el cual no era Juan Jimenez-Nava era el que me proveia la cantidad de metanfetamina.

Yo declaro (o certifico, verifico, o digo) bajo pena de perjuicio que lo que esta escrito es cierto y correcto.

Hecho en Marzo 03, 2020.

Hector Rivera-Diaz
Hector Rivera-Diaz

EXHIBIT 2

3

JUAN JIMENEZ NAVA
FCI OAKDALE II
FEDERAL CORRECTIONAL INSTITUTE
PO BOX 5010
OAKDALE, LA. 71463-5010

FEB 14 2019


UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT
600 SOUTH MAESTRI PLACE
NEW ORLEANS, LA 70130


ATTN: CLERK OF THE COURT OF APPEALS:

RE: REQUESTING CHANGE OF COURT APPOINTED COUNCIL,

My case number is 4:18-CR-00093-A-3, was motioned for appeal to this
court on October 22, 2018.  CASE NUMBER 18-11393 COURT OF APPEAL:

It is scheduled for the first filing by my appointed council FEB 28th
2019. I was during  the plea process represented by Ms. Pia R.
Lederman 817-860-8888 E-Mail: Pia@LedermanLawFirm.Com

When she was appointed she was also appointed for this appeal process
if I chose or needed to appeal.

On October 12th 2018, I was unbelievably sentenced to 262 months.
Durring the rushed Plea Process, I did not get a plea agreement offer
from the goverment, nor was advised that  I was facing a sentence
anywhere near 262 months.

As a result of a number of critical errors I have now insisted upon
an appeal of my sentencing and possibly my guilty plea.

I have tried for the last three months to contact Ms. Lederman, I
have tried to also have my sister contact her office on several times
with no sucess. On a number of dates I sent emails to her office,
from FCI Oakdale II system, to inform her and instruct her to get me
a new attorney through the appelant department of the federal public
defenders office.

On or about Jan 23rd 2019,I called the federal public defenders
Office appeals department to request assistance to replace Ms.
Lederman for the appeal process. They instructed me to write to this
court and to request that their office be appointed.

Around Jan 15th to 20th 2019, I called ms. lederman's office  several
times. I was calling on the recorded FCI Oakdale Inmate lines, that
i only use to call my wife and children because the time is
restricted to only 300 minutes per month or ten minutes per day.

/2

EXHIBIT 3

After a number of failed attempts by my sister, I finally reached Ms. Lederman's staff member on January 23 2019. The staff member could not set a time for me to speak with Ms. Lederman. I called four more times and was finally spoke with her on January 25th 2019.

Nothing was resolved and as a result of her avoiding my calls and emails I feel at this point that I can not trust her on my appeal. I am very concerned that my appeal process will like my sentencing turn out to be an unexpected disaster.

When I asked her staff they told me the following:

1) Ms. Lederman is not handling  my appeal and has givin the file away to another attorney.

I was told by her staff a Mr. Mark Mc Doo.

2) I am unable to have any contact with Mr. McDoo, nor has any of this  been confirmed by any correspondence.

Also much to my disadvantage, Ms. Lederman my attorney has been avoiding contact with me, which is prejudicial to my appeal process and any chance I have of success. it also jeopardises the entire fairness of the process.

MY REQUEST TO THE COURT:

My request to the Court is to replace Ms. Lederman and appoint the Federal Public Defenders Office in her place. I have spoken with the FPDO and they are aware of my case.

I am concerned that without the Court's assistance that my key appeal issues will not be presented with the critical facts  related to the events that have resulted in this unfair 21 year, 10 month sentence.

Further Ineffective Assistance Of Council, during the plea process is for certain an issue within my case, along with other factors.

The ineffective assistance of council combined with the avoidance of contact by my attorney, dispite my own efforts to contact her, plus my families efforts to contact her all point to a clear issue needing the courts intervention and the appoinment of new council. I am asking the Court to  ensure my rights to the appeal process are protected in a non prejudicial appeal and to have the assistance of Availiable Council, that I can speak with and work with plus also someone that I can trust as guarranteed by the United States rules and also the constitution. Currently I just do not feel that I can trust Ms. Lederman. I am pleading with the Court for assistance prose as an inmate and require crucial intervention to prevent a further violation of my rights to a throughall and unbaias Appeal process.

Sincerely Juan Jimenez Nava        JUAN JIMENEZ NAVA

EXHIBIT 3

EXHIBIT 3

JUAN JIMENEZ-NAVA
FED ID 57033-177
FCI OAKDALE II
PO BOX 5010
OAKDALE, LA 71463

MARCH 14, 2019

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT
600  SOUTH MAESTRI PLACE
SUITE 115
NEW ORLEANS, LA 70130

ATTN: MS. MELISSA V. MATTINGLY, DEPUTY CLERK
RE: USA V. JUAN JIMENEZ-NAVA
    USDC No.  4:18-CR-93-3
    No.  18-11393

Dear Ms. Mattingly,

I did receive your letter dated march 8,2019 yesterday March  13, 2019 at approximately
4pm.
I have not as of 4:00PM today, march 14, 2019 received the "Reply from Ms. Lederman to
the court". Regarding my plans to replace her. (Her Court order to Response)

It is critical that I be given "an extension", as to the time for my reply of at least
an additional 14 to 21 days, as I have not yet received her Court Order Response.

I have real concerns, that the court must consider with respect to my motion to replace
her, with the appointment  of the Federal Public Defenders Office, to complete my direct
appeal.

There are Fourth amendment issues within my case. Had these been properly explored, it
would have proven facts that could have exonerated me of the government's claims.

The warrantless search of the apartment in my case, was an "Illegal Search Without Justi-
fication", that resulted in my guilty plea and sentence.

Also there are other Constitutional claims that need to be explored. Since I have already
made some of my concerns known to the court, regarding Ms. Lederman, it is potentionally
very prejudicial, to have her prepare and submit a direct appeal. Also she did so, with-
out even discussing any of the concerns and issues that I had. In my view, all of this is
both concerning and prejudicial.

I am requesting an extention to ensure enough time to review and respond to her claims,
with respect to the court's order

Sincerely,
JUAN JIMENEZ-NAVA

EXHIBIT 4

MBnt JUAN FJIMENEZ-NAVA
FED ID 57033-177
FCI OAKDALE II
PO BOX 5010
OAKDALE,LA 71463-5010

March 30 2019

Mr. Lyle W.Cayce Clerk
United States Fifth Circuit
Court Of Appeals
600 South Maestri Place
New Orleans, LA 70130-3408

Re: United States v. Jimenez-Nava / 5th Circuit No. 18-11393

Dear Mr.Cayce:

Re Ms. Ledermans Response To The Court Dated March 6th 2019;


On Monday March 25th 2019, I received from the court, Ms. Ledermans
"Response to the Courts Order", enterd February 26 2019.
Although Ms. Lederman claims that she has an ethical and professional
obligation to keep me informed, she simply has not done so. this is not
our only issue.

I should never have been advised by Ms. Lederman to plead guilty. Not
only because of the extremely long sentence I was given, but more
fundamentally due to the fact that " a grave miscarriage of justice",
occurred because the DEA agents did not have a search warrant, nor did
they have constitutionally acceptable consent to enter the premises
where I was staying  and had only arrived at, two days prior. As a result
my rights were violated.

This unlawfull unwarranted entry is the only reason I was convicted.
the DEA agents obtained a key from the pocket of a 19 year old young
man when he was arrested. This young man has a very limited education
having only completed grade 8  and had no understanding of his rights.
The key was obtained under a clear coersion and also duress. Then the
DEA instead  of simply calling in for a warrant, or obtaining a warrant
took the key, came to the residence, opened the door without knocking
or announcing their presence and not only fully searched the apartment
but after arresting me failed to , as the Court Transcripts confirm
failed to read me my Miranda Rights.

EXHIBIT 5

As a result of these facts, my plea was involuntary, a result of
ineffective counsel who should have challenged the warrantless search
and the conduct of the DEA agents, as they clearly had no consent. The
young man had no authority over the apartment and did not live there
or even stay there. Plus the officers told him, that he could go back
home to Mexico if he agreed to simply give the address of the residence.
He also had only been in the United States for approximately 14 days,
and he also spoke no English.

He also  was pressured and cohersed and intimidated all of which  supports
the fact that the warrantless unannounced entry into the apartment that
I was staying at and found in, was infact an unconstitutional entry and
search. Why Ms. Lederman did not pursue this or discuss this option
with  me is again prejudicial, and it further supports my lack of
faith in her to put forward my direct appeal plus to represent me
in any capacity whatsoever moving forward.

as a result, I reiterate again for the Court as I did in my March 14,
2019 letter, that I firmly  **do not trust her with the protection of** my
**rights,** under any appeal or throughout any other Court process.

I have detailed below some of the ongoing issues and conflicts with
the claims in her "Responce To The Court Order" of February 26 2019.
My plea was done without a Goverment plea or any structured agreement
from the Goverment, which I now realize was also another attorney error.

I note for the court that I received a sentence on October 12 2018,
of 262 months or 21 years and 10 months. This was fully unexpected as
I was told by Ms. Lederman that I would get much less time if I simply
pled guilty and did so quickly.

Ms. Lederman states in her response to the Court Order, page 1 paragraph
4 and page 2 paragraph 1 (Exhibit 1), the following; "In his letter to
the Court Mr. Jimenez-Nava complains that he has been unable to reach
me. Initially it must be noted that an appeal under the circumstances
here will potentially remedy only errors that are firmly found in the
record and are supported by the applicable law.

EXHIBIT 5

To that end a client whose case is on appeal will have very little input into the technical aspects of the record review,research and drafting of an appelant brief.

clearly, such a reality in no way lessens my ethical and professional obligation to keep my client Mr. Jimenez-Nava fully apprised of the status of his case ".

First I want to direct the Courts attention to many errors in the letter expressed as facts by Ms. Lederman, who has not kept me informed about my case or the appeal and has repeatably provided faulty advise to me, both in her facts presented to the court and my own conversations with her. When and if conversations ocationally took place, her information and advise to me was in fact faulty or in error.

I point to page 2 paragraph 3 of Ms Lederman's response, where she has provided a list of times and, what she claims are conversations with myself, to demostrate some of these issues I have also included the inmate Bureau Of Prisons (BOP) phone records, from the applicable time period. As the BOP inmate phone records show, (these phone records can not be altered in any way), Ms. Lederman's claimed facts are almost completely erroneous.

The "call chart" included by Ms. Lederman shows 10 calls. The first four calls dated December 12 and 20, January 15 and 17 are all in error as my records show clearly, no calls at all took place during that time period.

On January 25,2019 we spoke for 7 minutes at 2:20 pm, this was the only conversation we had in the months of November, December and up until January 25,2019 almost 90 days. On February 01,2019, I spoke with one of her staff members about my concerns and about replacing Ms. Lederman. Although Ms. Lederman's chart shows two calls one for .27 seconds and the second for 7 minutes, only one call was possible at that time as two calls can not be made by an inmate within 30 minutes of one another. The BOP system does not allow it.

EXHIBIT 5

The BOP phone records show a second call, I made to her office that day, (Exhibit 2), at 11:31 am for 3 minutes. The purpose of this call was to request Ms. Lederman to file a motion to replace her, and to also obtain transcripts and Court records from my case as well, to ensure my appeal was being filed on time,and that I could find out about the appeal strategy.

Also on February 7,2019 Ms. Lederman again lists a call that did not take place. Ms. Lederman's chart does not show my call to her office on February 4,2019 at 3:27 pm where I spoke to her staff, stating that I wanted to replace her. The staff memeber instructed me to send an e-mail to Ms. Lederman about my concerns. On February 5,6,7 and 9,2019. I sent Ms. Lederman e-mails, I have enclosed them in that order as (Exhibits 3,4,5, and 6) respectively.

Ms. Lederman filed the Direct Appeal without any conversation with me. Further to this fact the appeal she filed is full of errors and also does not addresses the illegal and warrantless search of the residence where I was found, arrested and became charged within this case.

In my view given the seriousness of the illegal and warrantless, entry and search of the apartment residence, it is highly prejudicial that Ms. Lederman leaves all of those facts outside the court record. This action by her may also harm a future motion I have to bring to the court a 2255 motion that would fully detail these constitutional vilations and events.

Obviously the court is not apprised of all the issues regarding the search, the investigators  claims of consent given by a 3rd party under duress, but an evidence hearing if requiered would summarize these facts and what transpired that day.

Then on February 27,2019. The day that the brief was file at 11:51 pm Ms. Lederman sent me her first response to my requests the e-mail and phone messages to remove her as my counsel.

EXHIBIT 5

This e-mail from Ms. Lederman is marked as (Exhibit 7) and is simply an attempt by Ms. Lederman to appear that she was working on my case, the appeal and our communication. These claims are in fact ficticious, as we had no communication of any substance.

Also it must be noted that I was surprised when told by Ms. Lederman on January 25,2019, that she had given away my appeal file to another lawyer a Mr. Mark McDoo. I was unable to get any contact information regarding Mr. McDoo or what was going on with my appeal although I did try to also contact him.

It was not until I received information about the appeal being file by my family, who retreived a copy from PACER that I was able to see the document file by Ms. Lederman.

I simply do not trust Ms. Lederman and her commitment to explore every defense on my appeal, and there is no way with the exception of replacing her, that I will have an unbiased appeal process. Her letter "Response to the Court", and my correspondence to the Court and responses, show a gravelly defective and prejudicial relationship that can not be remedied, and should not be permitted to continue.

I also want to point out that I am not alone in my concerns regarding Ms. Lederman's dilligence or lack there of as an attorney.I requested one of my family members to look  online for information about her performance as we have no online access except e-mail in the BOP system, and my family found several disturbing complaints from formal clients which I have enclosed marked as (Exhibits 8,9 and 10).

In conclusion I wish to point out that there are several key issues that helped to secure my wrongfull conviction. These issues relate to the performance of Ms. Lederman I do not know if her appeal brief has any issues of correct law within it, nor do I know, given our difficult and prejudicial relationship, if she even addressed my issues and concerns to the court.

EXHIBIT 5

Prior to sentencing and during the PSI interview process, Ms. Lederman nodded off and fell asleep, while my interview was underway. With respect to the "PSR process", she never reviewed any of the PSR with me, although she wrongfully states in the transcript record, within Court that she did. Is this an error that the Court did not ask me to confirm that she had not gone over the PSR with me. Was it a violation of my rights to not have a chance to review my own PSR, or did my rights become violated while she slept through the interview process, I am an inmate and certainly not legally trained but the case law I have read here in prison seems to support the fact that my constitutional rights have been violated.

Given these facts and I am prepared to provide more details of the problems within this relationship of Ms. Lederman and I, if required to get the public defender's office appointed to my case.

I respectuflly motion the court for the appointment of the public defenders appelant team to file a more detailed and correct appeal on my behalf, and to ensure none of my further rights are violated.
Respectfully,

        JUAN JIMENEZ NAVA

Juan Jimenez Nava

Please note I am not able to make copies at the prison at this time and have sent only this single copy to the court.

EXHIBIT 5

JUAN JIMENEZ-NAVA
FED. ID. # 57033-177
FCI OAKDALE II
P.O. BOX 5010
OAKDALE, LA. 71463

August 12, 2019.

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT
600 SOUTH MAESTRI PLACE
NEW ORLEANS, LA. 70130

RE: UNITED STATES v. JIMENEZ-NAVA
CASE No. 4:18-CR-00093-A-3

Dear Clerk of the Court,

I am writing to the Court due to an issue with the
correspondence from my case.

I have had issues with my appointed counsel and these issues
continue. I did request a new Court appointed or "replacement
counsel", that the Court did not see necessary to appoint.

After complaining of my appointed counsel, I can not get the
attorney of record to copy me on any documents that I as an inmate,
can not secure for myself. I believe that I should be
"constitutionally entitled" to at least receive and be aware of:

1) What documents motions or actions are filed in my case
   and by whom;

and

2) To receive a copy of such documents, actions filings or
   "Court orders", so that I can protect any constitutional
   rights that I may have, and file anything required to do
   so.

EXHIBIT 6

1

I am requesting copies of all filed documents from 2019 only, so that I can review and in doing so, protect my rights to a "fair and just appeal process."

I thank you for your assistance and the copies of the pleadings, motions ruling or any "orders of the Court."

Sincerely

JUAN JIMENEZ

Juan Jimenez-Nava
Fed. Id. # 57033-177
FCI OAKDALE II
P.O. BOX 5010
OAKDALE, LA. 71463

EXHIBIT 6